UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAMES BLAZEK and ROBERT KENDRICK,
individually and on behalf of all others
similarly situated, and AOT                                          26 Civ.
TRANSPORTATION ARRIVE ON
TIME LLC and ABSOLUTE 1
TRANSPORT LLC, on behalf of
themselves and all others similarly
situated,

                              *Plaintiffs*,

                    -against-


MEDICAL ANSWERING SERVICES, LLC,

                              *Defendant*.
-------------------------------------------------------------X

## CLASS ACTION COMPLAINT

Plaintiffs James Blazek ("Blazek") and Robert Kendrick ("Kendrick"), and their respective

companies AOT Transportation Arrive On Time LLC ("AOT") and Absolute 1 Transport LLC

("Absolute 1," and together with Blazek, Kendrick, and AOT, "Plaintiffs"), by and through

undersigned counsel, allege as follows against Defendant Medical Answering Services, LLC

("MAS" or "Defendant"):

### NATURE OF THE ACTION

1.      This action arises from Defendant's systemic misuse of its Medicaid non-

emergency medical transportation ("NEMT") broker role and platform to (a) misclassify NEMT

drivers as "independent contractors" while exercising employer-level control and denying

minimum wage, overtime, and other wage protections under the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 201 *et seq.*, the New York Labor Law ("NYLL"), and applicable

regulations; and (b) breach MAS's uniform transportation provider contracts and related common-law duties to terminate smaller providers on a pretext and divert their business to larger transportation companies.

2.      MAS's platform design, scheduling practices, and refusal to honor providers' blocked-out time and availability constraints artificially inflate "reassignment" and "refusal" rates and render those metrics unreliable and pretextual. MAS then uses those inflated metrics to terminate providers, ignore contractual notice and appeal protections, and reassign loyal Medicaid riders to other, larger vendors.

3.      Plaintiffs bring (a) federal wage-and-hour claims and seek collective-action treatment under 29 U.S.C. § 216(b) on behalf of similarly situated drivers; and (b) NYLL and New York common-law claims and seek class-action treatment under Fed. R. Civ. P. 23 on behalf of similarly situated drivers and similarly situated NEMT provider entities.

4.      Plaintiffs demand a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

### JURISDICTION AND VENUE

5.      This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims arising under the FLSA, 29 U.S.C. § 201 et seq.

6.      This Court has supplemental jurisdiction over Plaintiffs' NYLL and New York common-law claims under 28 U.S.C. § 1367 because those claims are part of the same case or controversy as the federal claims.

7.      In addition, and in the alternative, the Court has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because (a) the proposed Rule 23 class(es) number,

upon information and belief, at least 100 members; (b) minimal diversity exists; and (c) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

8.      MAS is subject to personal jurisdiction in New York. MAS is a New York limited liability company that conducts substantial, continuous business throughout New York State as the designated statewide Medicaid transportation broker.

9.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 because MAS "resides" in this District for venue purposes, including under 28 U.S.C. § 1391(d).

10.      MAS's SDNY contacts include, without limitation, MAS's administration of Medicaid NEMT brokerage services in the "Downstate" region, which includes counties within this District, including New York County (Manhattan) and Bronx County, and MAS's regular and continuous dispatching, scheduling, and management of NEMT rides to and from healthcare providers and Medicaid enrollees in this District.

11.      Upon information and belief, MAS enters into and performs uniform provider agreements with transportation providers operating within this District and administers trip requests, trip assignments, performance metrics, and provider discipline/termination in this District through its centralized platform and associated policies.

**PARTIES**

12.      Plaintiff Jim Blazek is an individual who, at all relevant times, resided in New York State and operated AOT as a sole owner/provider of NEMT services through MAS's Medicaid transportation provider network.

13.      Plaintiff Bob Kendrick is an individual who, at all relevant times, resided in New York State and operated Absolute 1 as an owner/provider of NEMT services through MAS's Medicaid transportation provider network.

14.     Plaintiff AOT Transportation Arrive On Time LLC is a New York limited liability company owned and operated by Blazek.

15.     Plaintiff Absolute 1 Transport LLC is a New York limited liability company owned and operated by Kendrick.

16.     Defendant Medical Answering Services, LLC is a New York limited liability company with its principal place of business in Syracuse, New York.

17.     MAS is designated by the New York State Department of Health ("NYSDOH") as the statewide broker for the Medicaid transportation program and manages the provider network, trip assignments, performance metrics, and platform used by transportation providers such as Plaintiffs.

## FACTUAL ALLEGATIONS

### MAS's Statewide Broker Role and Control Over Providers

18.     Under its contracts with NYSDOH and applicable New York law, MAS is responsible for establishing and managing the Medicaid Transportation Provider Network, including receiving transportation requests from Medicaid enrollees, verifying eligibility, assigning trips to providers, and ensuring compliance with the New York State Medicaid Transportation Policy Manual (the "Manual").

19.     MAS operates as the gatekeeper to Medicaid NEMT riders and controls providers' access to rider demand. Providers such as Plaintiffs cannot build an independent Medicaid-rider customer base outside MAS's network.

20.     MAS unilaterally sets the compensation structure for trips (including per-ride and mileage components). Providers have no meaningful ability to negotiate compensation terms.

21.    MAS requires providers to use MAS's secure software platform and roster system to receive reservations, accept/decline assignments, and manage schedules.

22.    MAS imposes strict timing requirements, including requirements that providers pick up enrollees within approximately fifteen (15) minutes of the scheduled time, creating safety and compliance pressure when assignments are unrealistic.

### MAS's Downstate Operations Include New York County and Bronx County

23.    MAS administers NEMT brokerage services in Downstate New York, including counties within this District, including New York County and Bronx County, and other Downstate counties.

24.    MAS is the transportation contact for Medicaid transportation management in New York City (all boroughs) and Westchester County and uses a Downstate/NYC telephone contact number for those jurisdictions.

25.    MAS's Downstate-region operations include the administration and coordination of NEMT rides for Medicaid enrollees traveling to Medicaid-covered services in this District, including trips to and from healthcare providers in Manhattan and the Bronx.

### Provider Network Contracts and Key Provisions

26.    On or about January 3, 2024, MAS and AOT entered into a written Transportation Provider Network Contract (the "AOT Contract"), which governs MAS's assignment of trips to AOT and AOT's provision of NEMT services to Medicaid enrollees.

27.    On or about September 29, 2021, MAS and Absolute 1 entered into a written Transportation Provider Network Contract (the "Absolute 1 Contract"), which is upon information and belief a materially identical form agreement governing MAS's assignment of trips to Absolute 1 and Absolute 1's provision of NEMT services.

28.     Key provisions of MAS's provider contracts (including the AOT Contract and, upon information and belief, the Absolute 1 Contract) include:

   a. Section 24: MAS will only assign trips that the Provider's Transportation Provider Profile ("TPP") indicates the provider can accommodate.

   b. Section 43.1: Either party may terminate without cause upon ninety (90) days' written notice.

   c. Section 43.2: Either party may terminate upon thirty (30) days' written notice of a material breach, with a ten (10) day opportunity to cure.

   d. Section 43.3: MAS may immediately terminate only in cases of defined "default" (such as fraud, threats, or insurance lapse).

   e. Section 45: For performance issues, MAS may suspend a provider or request a corrective action plan as an intermediate step.

   f. Section 47: Upon a provider's appeal, MAS representatives must meet "with the intent of resolving the dispute."

29.     The provider contracts require compliance with the Manual, which, among other things, obligates providers to maintain up-to-date TPPs regarding availability and closures and to ensure compliance with passenger safety and vehicle and traffic laws.

30.     Plaintiffs complied with the provider contracts, the Manual, and applicable law at all relevant times.

**MAS's Incentives Under State Brokerage Contracts**

31.     Upon information and belief, MAS is compensated through state brokerage contracts based on, among other things, an administrative fee structure and financial performance against target budgets for NEMT services. These financial structures create incentives for MAS to reduce transportation service expenditures and to manage provider networks in ways that increase MAS's financial margins, including by preferring larger providers and eliminating smaller providers who cannot safely absorb impossible scheduling assignments.

**MAS's Scheduling Platform Design Creates Impossible Assignments and Inflated Reassignment Rates**

32.     MAS's platform allows providers to block out entire calendar days on which they are unavailable, but does not allow providers to block specific time windows within a day (*e.g.*, 9:00 a.m. to 11:00 a.m. only).

33.     As sole-operator and small providers, Plaintiffs frequently had multiple trips scheduled in a given day. Because they could not block specific times, MAS repeatedly assigned trips during time periods when Plaintiffs were already committed to previously assigned rides or were physically located miles away in another county.

34.     MAS's overbooking and overlapping assignments forced providers into an untenable choice: (a) refuse or request reassignment of trips that were unsafe, unlawful, or impossible to perform on time (which MAS tracked as negative "reassignment" or "refusal" metrics), or (b) attempt to perform all assigned trips and risk violating the fifteen-minute pickup requirement, traffic laws, and/or passenger safety standards.

35.     When providers did the responsible and contract-compliant thing (*i.e.*, refusing trips that would be unsafe, unlawful, or impossible to perform on time) MAS's system recorded those necessary refusals as demerits that inflated providers' "reassignment" or "refusal" rates.

36.     MAS's scheduling, rostering, and platform design thereby violate Section 24 of MAS's provider contracts, which obligate MAS to assign only trips that the provider's TPP indicates the provider can accommodate.

37.     MAS maintained internal scorecards or dashboards for providers, including metrics labeled "reassignment" or "refusal" rates, and color-coded those metrics (*e.g.*, green, yellow, orange) based on MAS-determined thresholds.

7

38.     MAS's reassignment-rate metric is unreliable as a measure of provider performance because it is materially driven by MAS's own scheduling practices and platform limitations.

39.     Similar allegations regarding MAS's systemic overbooking, disregard of blocked-out dates, overlapping rides, and resulting inflated refusal/reassignment rates have been asserted by another MAS provider, 1 On 1 Transportation LLC, in a Verified Complaint filed in the Supreme Court of the State of New York, Onondaga County, Index No. 004492/2025.

**Blazek's Work History, Control, and Misclassification**

40.     From approximately 2021 through March 2025, Blazek, through AOT, provided NEMT services to Medicaid enrollees via MAS's platform and at MAS's direction.

41.     Blazek performed this work as his primary occupation and source of income and routinely worked well over forty (40) hours per week, including early mornings, evenings, and weekends, to fulfill MAS-assigned rides.

42.     MAS exercised pervasive control over Blazek's work, including: (a) exclusive control over trip assignment and access to Medicaid riders; (b) mandatory use of MAS's secure platform; (c) strict timing requirements; and (d) the practical ability to terminate access to all Medicaid transportation work on one day's notice.

43.     Plaintiffs were economically dependent on MAS for NEMT transportation work and could not build an independent customer base for Medicaid riders outside MAS's network.

44.     Notwithstanding this degree of control and economic dependence, MAS classified Blazek as an "independent contractor," did not treat him as an employee for wage-and-hour purposes, and did not pay overtime premiums when he worked more than forty (40) hours per week.

8

**Kendrick's Work History, Control, and Misclassification**

45.    During the relevant period, Kendrick, through Absolute 1, provided NEMT services to Medicaid enrollees via MAS's platform and at MAS's direction.

46.    Kendrick performed this work as a primary occupation and source of income and routinely worked in excess of forty (40) hours per week fulfilling MAS-assigned rides.

47.    MAS exercised the same pervasive control over Kendrick and Absolute 1 that it exercised over Blazek and AOT, including exclusive control over trip assignments and access to Medicaid riders, mandatory use of MAS's platform, strict timing requirements, unilateral rate setting, performance dashboards, and unilateral termination authority.

48.    MAS classified Kendrick as an "independent contractor" and failed to pay overtime premiums when he worked more than forty (40) hours per week.

**Absence of Service Quality Issues; The "Arias" Assurance**

49.    At all relevant times, Blazek's rides were completed without complaints or discipline regarding the quality of service.

50.    A MAS field liaison named "Arias" expressly assured Blazek in writing that "reassignment rates are not punitive," or words to that effect.

51.    Relying on that assurance, Blazek continued to accept rides and manage schedules as before, and in March 2025 purchased a second vehicle for approximately $30,000 to expand his NEMT business within MAS's network.

52.    Contrary to Arias's assurance, MAS later relied primarily or exclusively on Blazek's reassignment rate—which MAS itself had artificially inflated through its flawed system—to justify termination.

**Termination of Blazek/AOT**

53.    On or about March 27, 2025, MAS informed Blazek and AOT that they were terminated from the MAS network effective March 28, 2025—one day's notice.

54.    MAS cited Blazek's alleged "high reassignment rate," which MAS placed in the "orange" range of its internal scorecard (approximately 45%).

55.    MAS did not provide ninety (90) days' written notice of a no-cause termination as required by Section 43.1.

56.    MAS did not provide thirty (30) days' written notice of any alleged material breach, did not describe the alleged breach in writing, and did not provide a ten (10) day opportunity to cure as required by Section 43.2.

57.    MAS did not request or invite AOT to submit a corrective action plan addressing alleged performance concerns, as contemplated by Section 45.

58.    There was no "default" within the meaning of Section 43.3. Plaintiffs did not engage in fraud, threatening conduct, insurance lapses, or other defined default conduct, and MAS never claimed otherwise.

59.    MAS's abrupt termination effectively destroyed AOT's business as a Medicaid transportation provider, eliminated ongoing income, and rendered Blazek's recent vehicle investment economically irrational.

**Termination of Kendrick/Absolute 1**

60.    On or about March 20, 2025, MAS informed Kendrick and Absolute 1 that they were terminated from the MAS network effective at the close of business the next day (March 21, 2025) citing "high reassignment rate" and/or substantially similar metric-based justification.

61.     MAS's stated justification for Kendrick/Absolute 1's termination was, upon information and belief, likewise the product of MAS's own scheduling and platform design and not a fair or reliable performance measure.

62.     MAS did not provide Kendrick/Absolute 1 the contractual notice, cure opportunity, corrective-process options, or good-faith appeal process required by MAS's provider contracts.

### The Contractual Appeal Process and MAS's Bad-Faith "Review"

63.     MAS's provider contracts provide an appeal process under which, when a provider appeals a termination, MAS representatives must meet with the provider "with the intent of resolving the dispute."

64.     Blazek requested meetings with MAS decision-makers, including MAS's Vice President of Transportation, Nick Corbishley, to appeal the termination and explain the structural and scheduling problems inflating his reassignment rate.

65.     MAS denied or ignored these requests and refused to meet in good faith. Instead, MAS conducted a perfunctory internal review and rubber-stamped its own termination decision.

66.     Upon information and belief, MAS applied the same perfunctory, non-independent appeal process to Kendrick and Absolute 1.

### WAGE-AND-HOUR ALLEGATIONS COMMON TO THE FLSA COLLECTIVE AND NYLL CLASS

67.     MAS's business model depends on a statewide workforce of drivers who perform NEMT rides that are integral to MAS's broker operations.

68.     MAS centrally controls the key aspects of drivers' work: access to Medicaid riders, trip assignments, rules, timing standards, required platform usage, and termination authority.

69.     Drivers' opportunity for profit or loss is constrained by MAS's unilateral rate setting and MAS's control over volume and timing of trips.

70.     Drivers' work is not a distinct business operating independently of MAS; rather, it is functionally integrated into MAS's statewide NEMT brokerage operations.

71.     MAS willfully misclassified drivers as independent contractors to shift costs (including insurance-related and employment-related costs) away from MAS and onto drivers.

72.     As a result, MAS failed to pay minimum wage and overtime as required under the FLSA and NYLL, including for weeks where drivers worked more than forty (40) hours.

### FLSA COLLECTIVE ACTION ALLEGATIONS (29 U.S.C. § 216(b))

73.     Blazek and Kendrick bring Count I as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of themselves and all other similarly situated individuals (the "FLSA Collective") who, during the three (3) years preceding the filing of this Complaint through final judgment: (a) performed NEMT driving services for MAS in New York State; (b) were classified as independent contractors (*e.g.*, paid via 1099 or treated as non-employees); (c) worked more than forty (40) hours in one or more workweeks; and (d) were not paid overtime compensation at one and one-half times their regular rate of pay.

74.     Members of the FLSA Collective are similarly situated because MAS applied common policies and practices regarding classification, scheduling control, compensation structure, platform requirements, and overtime nonpayment.

75.     MAS's FLSA violations were willful, entitling Plaintiffs and the FLSA Collective to a three-year limitations period under 29 U.S.C. § 255(a).

## RULE 23 CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring their NYLL and New York common-law claims on behalf of themselves and the following proposed Rule 23 classes (collectively, the "Rule 23 Classes"), subject to refinement through discovery:

**NYLL Wage Class:**

77.     All individuals in New York State who performed NEMT driving services for MAS, were classified as independent contractors, and were not paid all wages due (including overtime) under NYLL during the six (6) years preceding the filing of this Complaint through final judgment.

**Provider Contract and Termination Class:**

78.     All New York transportation provider entities (including single-operator companies) who contracted with MAS under MAS's Transportation Provider Network Contract (or materially identical form contract) and were terminated and/or suspended and/or materially disciplined primarily based on reassignment/refusal metrics during the six (6) years preceding the filing of this Complaint through final judgment.

**Subclasses (if necessary):**

79.     Subclass A (Reassignment Metrics): Those terminated primarily for "high reassignment rate" / "high refusal rate" / "reassignment/refusal" metrics. 80. Subclass B (Fraud Allegations): Those terminated primarily under fraud-related grounds (if discovery shows distinct issues warrant separate treatment).

81.     **Numerosity**: The Rule 23 Classes are so numerous that joinder is impracticable. Upon information and belief, MAS terminated numerous providers under metric-based rationales and misclassified numerous drivers statewide, including in this District.

82.     **Commonality**: Common questions include, without limitation: (a) whether MAS's platform and scheduling practices systematically create overlapping/impossible assignments; (b) whether MAS's reassignment/refusal metrics are artificially inflated by MAS's system; (c) whether MAS breached Section 24 by assigning trips providers could not accommodate; (d) whether MAS's terminations complied with Sections 43.1, 43.2, 43.3, 45, and 47; (e) whether MAS misclassified drivers under the FLSA and NYLL; (f) whether MAS's conduct was willful; and (g) the proper measure of damages and equitable relief.

83.     **Typicality**: Blazek, Kendrick, AOT, and Absolute 1's claims are typical of the claims of the Rule 23 Classes because they arise from the same standardized policies, contract provisions, platform design, termination practices, and wage practices.

84.     **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Rule 23 Classes and have no conflicts with the classes they seek to represent. Plaintiffs have retained counsel experienced in wage-and-hour and complex litigation.

85.     Predominance and Superiority: Common issues predominate over individual issues, and class treatment is superior to individual litigation because the claims arise from standardized contracts and centralized policies, and class resolution will conserve judicial resources and provide a practical mechanism for relief.

**COUNT I**
**FAIR LABOR STANDARDS ACT –**
**UNPAID OVERTIME AND MINIMUM WAGE**
**(Collective Action – Against MAS by Blazek and Kendrick and the FLSA Collective)**

86.     Plaintiffs repeat and reallege paragraphs 1 through 85 as if fully set forth herein.

87.     MAS is an "employer" within the meaning of 29 U.S.C. § 203(d).

88.     Blazek, Kendrick, and similarly situated drivers are "employees" under 29 U.S.C. § 203(e) based on the economic realities of the relationship.

89.     Blazek and Kendrick regularly worked more than forty (40) hours per week while performing NEMT services through MAS's network.

90.     MAS failed to pay overtime compensation at one and one-half times the regular rate for hours worked over forty (40) in a workweek, in violation of 29 U.S.C. § 207.

91.     To the extent applicable, MAS also failed to ensure payment of minimum wages as required by 29 U.S.C. § 206, including where uncompensated time, waiting time, and platform-required time is counted.

92.     MAS's violations were willful.

93.     Plaintiffs and the FLSA Collective are entitled to recover unpaid overtime and other wages due, liquidated damages under 29 U.S.C. § 216(b), attorneys' fees, and costs.

## COUNT II
### NEW YORK LABOR LAW – UNPAID WAGES AND OVERTIME
#### (Rule 23 Class – Against MAS by Blazek and Kendrick and the NYLL Wage Class)

94.     Plaintiffs repeat and reallege paragraphs 1 through 93 as if fully set forth herein.

95.     At all relevant times, Blazek and Kendrick were "employees" and MAS was an "employer" under NYLL Article 6 and Article 19 and implementing regulations, notwithstanding MAS's classification of them as independent contractors.

96.     Blazek and Kendrick regularly worked more than forty (40) hours per week while providing NEMT services through MAS's network.

97.     MAS failed to pay overtime premiums and, at times, proper minimum wage and spread-of-hours compensation as required by the NYLL and applicable regulations.

98.     MAS's violations of the NYLL were willful.

99.    Plaintiffs and the NYLL Wage Class are entitled to recover unpaid wages and overtime, liquidated damages, statutory damages where applicable, pre- and post-judgment interest, attorneys' fees, and costs.

**COUNT III**
**BREACH OF CONTRACT**
**(Rule 23 Class – Against MAS by AOT and Absolute 1 and the Provider Contract and Termination Class)**

100.    Plaintiffs repeat and reallege paragraphs 1 through 99 as if fully set forth herein.

101.    MAS entered into uniform Transportation Provider Network Contracts with AOT, Absolute 1, and similarly situated provider entities.

102.    AOT and Absolute 1 performed their obligations under the contracts and complied with the Manual and applicable law.

103.    MAS materially breached the provider contracts, including but not limited to:

a.  violating Section 24 by assigning trips that providers could not reasonably accommodate based on their TPP and known availability; failing to provide ninety (90) days' notice for a no-cause termination under Section 43.1;

b.  failing to provide thirty (30) days' notice and a ten (10) day cure opportunity for any alleged material breach under Section 43.2;

c.  failing to request a corrective action plan or use intermediate steps for performance issues under Section 45; and

d.  failing to honor the appeal process and meeting requirement under Section 47.

104.    MAS's asserted justification for termination (*i.e.*, "high reassignment rate") was the direct product of MAS's own structural violations of the contracts and the Manual, including its overbooking and scheduling practices, and thus cannot excuse MAS's breaches.

16

105.    As a direct and proximate result of MAS's breaches, AOT, Absolute 1, and the

Provider Contract and Termination Class suffered substantial damages, including loss of current

and future business, lost profits, and destruction of provider business value.

**COUNT IV**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**
**(Rule 23 Class – Against MAS by AOT and Absolute 1 and the Provider Contract and**
**Termination Class)**

106.    Plaintiffs repeat and reallege paragraphs 1 through 105 as if fully set forth herein.

107.    MAS's provider contracts contain an implied covenant of good faith and fair

dealing obligating MAS to refrain from acting in a manner that would destroy or injure providers'

right to receive the benefits of the contract.

108.    MAS breached the implied covenant by, among other things: (a) manipulating its

scheduling and roster systems in a way that ensured providers would incur excessive reassignment

metrics simply by complying with the contract and the law; (b) using those inflated metrics as a

pretext to terminate providers and divert riders to other vendors; and (c) refusing to engage in

good-faith appeals or corrective processes and instead rubber-stamping termination decisions.

109.    MAS's conduct deprived AOT, Absolute 1, and similarly situated providers of the

fruits of the contractual bargain, including the ability to continue operating as Medicaid

transportation providers and reap the benefits of their developed rider relationships.

110.    As a result, AOT, Absolute 1, and the Provider Contract and Termination Class

suffered damages including lost profits, lost business value, and consequential damages.

**COUNT V**
**PROMISSORY ESTOPPEL**
**(Against MAS by Blazek and AOT, and similarly situated persons to the extent proven)**

111.    Plaintiffs repeat and reallege paragraphs 1 through 110 as if fully set forth herein.

112.    MAS, through its field liaison Arias, made a clear and unambiguous promise to Blazek that "reassignment rates are not punitive," or words to that effect.

113.    MAS reasonably should have expected Blazek to rely on that assurance in structuring his business and making investment decisions.

114.    Blazek reasonably relied on MAS's promise by continuing to operate within MAS's system, accepting rides, and investing approximately $30,000 in a second vehicle to expand his MAS-based NEMT business.

115.    MAS then terminated Blazek/AOT based on the very reassignment metrics it had promised would not be used punitively.

116.    Blazek's reliance was foreseeable and resulted in substantial detriment, including loss of business and wasted investment.

117.    Injustice can be avoided only by enforcement of MAS's promise or by awarding compensatory and consequential damages.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS / PROSPECTIVE ECONOMIC ADVANTAGE
### (Against MAS by All Plaintiffs)

118.    Plaintiffs repeat and reallege paragraphs 1 through 117 as if fully set forth herein.

119.    Plaintiffs had ongoing and prospective business relationships with Medicaid enrollees who regularly used their services, including standing orders and recurring trips to medical and mental health appointments.

120.    Plaintiffs had a reasonable expectation of continued repeat business from those enrollees and additional enrollees using MAS to schedule rides.

121. MAS knew of these relationships and expectations; indeed, those relationships existed because MAS assigned riders to Plaintiffs.

122. MAS intentionally and unjustifiably interfered with Plaintiffs' business relationships by: (a) designing and operating a scheduling and metrics system that ensured Plaintiffs would accumulate inflated reassignment rates when they complied with safety and legal requirements; (b) using those inflated metrics as a pretext to terminate Plaintiffs; and (c) reallocating Plaintiffs' riders and established customer base to other transportation companies for MAS's benefit.

123. MAS acted with malice and improper motive, including a preference for larger providers that generated greater gross revenues and a desire to eliminate smaller, sole-operator providers from its network.

124. As a direct result, Plaintiffs lost ongoing and prospective business, customer base value, and substantial present and future profits.

125. Plaintiffs are entitled to compensatory damages, punitive damages, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A. On Count I (FLSA), certify the FLSA Collective for purposes of notice, award unpaid overtime and other wages due, liquidated damages, attorneys' fees, costs, and pre- and post-judgment interest as allowed by law;

19

B. On Count II (NYLL), certify the NYLL Wage Class under Rule 23, award unpaid wages and overtime, liquidated damages, statutory damages where applicable, attorneys' fees, costs, and pre- and post-judgment interest;

C. On Counts III and IV (contract and implied covenant), certify the Provider Contract and Termination Class under Rule 23 and award compensatory, consequential, and future lost profit damages in an amount to be proven at trial;

D. On Count V (promissory estoppel), award compensatory and consequential damages including vehicle investment damages and lost business opportunity damages;

E. On Count VI (tortious interference), award compensatory and punitive damages in an amount to be proven at trial;

F. Award such other and further legal and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Dated:          March 2, 2026
                Jersey City, New Jersey


/s/ Lee Jacobs
Lee Nolan Jacobs
Lee Jacobs & Associates LLC
97 Newkirk Street, Suite 207
Jersey City, NJ 07306
lee@jacobslegal.com
(646) 212-7234
*Attorneys for Plaintiffs*